NUMBER 13-09-00008-CR


 

COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 

 

EDWARD BRANTON WHITE A/K/A

EDWARD BRANDON WHITE, Appellant,


v.


THE STATE OF TEXAS, Appellee.

 


On appeal from the 117th District Court 

of Nueces County, Texas.

 


MEMORANDUM OPINION


Before Justices Rodriguez, Garza, and Benavides


Memorandum Opinion by Justice Garza
 Appellant, Edward Branton White a/k/a Edward Brandon White, was charged by
indictment with driving while intoxicated ("DWI"), a class B misdemeanor. See Tex. Penal
Code Ann. § 49.04(a)-(b) (Vernon 2003). This charge was enhanced because appellant
had two prior convictions for DWI and two prior felony convictions for retaliation and bail
jumping. See id. §§ 12.42(d), (1) 49.09(b)(2) (Vernon Supp. 2009). A Nueces County jury
convicted White of the underlying offense, and the trial court sentenced him to twenty-five
years' incarceration in the Institutional Division of the Texas Department of Criminal Justice
("TDCJ-ID") with no fine. By three issues on appeal, appellant asserts that: (1) his
retained trial counsel, John Gilmore, did not provide him with effective assistance; (2)
evidence supporting the enhancement paragraph of the indictment was legally and
factually insufficient; and (3) the judgment of conviction is void because the jury's verdict
was not unanimous. We affirm. I. Factual and Procedural Background

 White was indicted for the underlying offense on June 26, 2008. Prior to trial,
Gilmore filed numerous motions with the trial court, including: (1) a motion in limine; (2)
a rule 404(b) request for notice of the State's intent to offer extraneous conduct evidence,
see Tex. R. Evid. 404(b); (3) a motion for discovery, production, and inspection of
evidence; and (4) a motion to prohibit the State from introducing statements made by
White to police. The trial court granted White's motion in limine but did not rule on the
other motions filed. 

A. The Guilt-Innocence Phase

 Trial commenced on December 1, 2008. At trial, the State called several witnesses,
including Milton Lugo and Corpus Christi police officers Michael Rogers and John
McGinley, to establish that White was driving his truck while intoxicated. 

 Lugo, White's neighbor, testified at trial that, on the day in question, he was inside
his house when he heard White yelling for Lugo to move his truck. Lugo testified that he
had known White for several years and that it appeared to him that White was intoxicated
because White was yelling and slurring words. Upon viewing White's erratic behavior,
Lugo instructed his girlfriend to call the police. On cross-examination, Lugo admitted that
he and White had an ongoing dispute regarding ownership of a driveway and the fence
between their houses. Lugo acknowledged that he had called the police complaining about
White on several occasions in the past year.

 Officer Rogers testified that when he arrived at the scene, he saw White's truck
back into the driveway and White exit the truck from the driver's side with the keys to the
truck in his hand. When Officer Rogers approached White to question him about the
disturbance, White got into an aggressive, fighting stance. Officer Rogers tried to calm
White and get him to sit down so they could discuss the incident; however, White resisted
and the two men wrestled and fell onto a piece of equipment in the driveway. As a result
of the fall, White sustained lacerations to his head. Officer Rogers testified that he
believed White was intoxicated because he was swaying, his speech was slurred, his eyes
were bloodshot, and his breath smelled of alcohol. Officer Rogers asked White to provide
a breath sample and to perform field sobriety tests, but White refused to comply. White
was then taken to the hospital to treat the laceration to his head. While en route to the
hospital, White volunteered to give a blood sample but later refused to do so. On cross-examination, Officer Rogers admitted that he did not personally see White driving and that
the only thing he saw was White get out of the truck with the keys in his hand. Moreover,
Officer Rogers noted that White's belligerence likely was due to his unhappiness with being
questioned by police.

 Officer McGinley testified that he assisted Officer Rogers on the disturbance call. 
Officer McGinley recalled seeing White exit the driver's side of the truck with the truck keys
in his hand. Officer McGinley found the truck keys in White's pocket when conducting a
pat down. Officer McGinley noted that: (1) White was very aggressive; (2) he and Officer
Rogers "smelled quite a bit of alcohol" on White's breath; and (3) White was wobbly, had
red, glassy eyes, and slurred speech. Officer McGinley further noted that, while on the way
to the hospital, White expressed that he would "settle for a P.I. and the criminal mischief
to the neighbor's door" in exchange for dropping the DWI charge. Officer McGinley had
no doubt that White was intoxicated at the time in question. On cross-examination, White's
trial counsel questioned Officer McGinley about White's repeated statements that he was
not driving the truck and emphasized that Officer McGinley had not actually seen White
driving the truck.

 White called several witnesses on his behalf, including his father, Edward White,
Lane Burke, and Johnny Paiyou. Edward testified that White lived with him, but at the time
in question, Edward was not home. Edward further testified that he had a video
surveillance system that was installed outside the house. The system recorded the arrest
of White, and Edward alleged that the video showed that Paiyou was driving the truck. 
Edward later admitted that he accidentally destroyed the video recording the arrest. 
Edward also testified that White and Lugo had a long-standing feud. 

 Lane Burke testified that he worked for White in White's tree business and that, at
the time in question, he was a passenger in White's truck and Paiyou was driving the truck. 
The State impeached Burke by noting his prior convictions for theft and possession of a
controlled substance. Burke later admitted that he left the scene before the police arrived.

 Paiyou testified that he worked for White's tree company and that two years ago,
White fell forty feet from a tree and was in a coma for over thirty days. Paiyou noted that
he was aware that White was in a custody battle with his ex-wife, Alicia Reynaga, in
Minnesota and that Reynaga had allegedly fled from Corpus Christi to Minnesota with
White's son. Paiyou testified that at the time in question, he was driving the truck and
there had not been a disturbance between White and Lugo. However, on cross-examination, the State impeached Paiyou with a litany of convictions. On re-direct
examination, Paiyou stated that he did not believe that White was intoxicated.

 The defense rested, and the State announced that it had a surprise rebuttal witness,
which Gilmore surmised was Reynaga. Gilmore inquired about the substance of
Reynaga's testimony and asserted that Reynaga's testimony was subject to the order in
limine prohibiting the introduction of White's previous bad acts. 

 However, before Reynaga testified, a juror communicated to the trial court that he
had been harassed by a witness in the case. The witness was later identified as Paiyou. 
The juror stated that Paiyou made the following comments while in the juror's presence: 
"We can't tamper with the jurors. Hey, jurors, hey jurors . . . ." The juror believed that
Paiyou was mocking the jurors and that as a result of the comments, the juror did not
believe that Paiyou was a credible person. The juror stated that he did not tell any other
jurors about the incident and that he was the only one who overheard the comments made
by Paiyou. After discussing the situation with counsel for both sides, the juror was excused
from service on the jury; the parties agreed to proceed with eleven jurors. (2) The trial court
informed the remaining jurors about the situation and instructed them that their verdict still
needed to be unanimous.

 Reynaga testified that she was previously in a long-term relationship with White and
that they had a son together. Reynaga admitted that she kept in contact with Paiyou in
order to check up on White. She noted that Paiyou told her that White had paid him to
provide false testimony--that Paiyou was the driver of the truck when it had actually been
White. White's trial counsel objected to this question and answer, and the State
responded that it was using the testimony for impeachment purposes. A hearing was
conducted outside the jury's presence and, after previewing Reynaga's testimony, the trial
court overruled White's objection. Reynaga stated that when White and Paiyou were in
the truck together, White always drove. She also stated that White would "drink and drive
a lot." On cross-examination, Gilmore implied that Reynaga desired to have White sent
to prison so that she could get custody of their son. Reynaga confirmed that White and
Lugo do not get along. On re-direct, Reynaga testified that she had to get a protective
order against White because he had abused her in the past. She also testified that
Edward was not truthful and would lie to protect his son. 

 The State then rested. During closing argument, Gilmore conceded that White was
intoxicated at the time in question and stated that the only issue for the jury to decide was
whether White drove the truck. He argued that the only person who alleged to have seen
him driving the truck was Lugo, the next-door neighbor with whom White had an ongoing
feud. The jury subsequently convicted White of felony DWI.

B. The Punishment Phase

 White elected for the trial court to assess punishment. At the hearing, the State
called Mike Hummel, a member of the Corpus Christi city council, and Nueces County
Sheriff's Department Lieutenant Fred Flores to establish White's prior felony convictions. 
Councilman Hummel testified that he worked previously for the Nueces County District
Attorney's Office and that he had prosecuted White before. Councilman Hummel recalled
prosecuting White for retaliation in June 1993, and that White received probation for that
charge. Councilman Hummel also noted that White's probation was revoked in 1995. The
judgment corresponding to White's previous retaliation conviction was tendered and
admitted into evidence. 

 Lieutenant Flores testified that he had worked for the Nueces County Sheriff's
Department for thirty-one years as a fingerprint expert. Lieutenant Flores compared
fingerprints that were taken recently from White to fingerprints in State's exhibit 11, which
was the pen packet associated with White's felony bail jumping conviction. Lieutenant
Flores testified that the fingerprints in the pen packet matched the fingerprints that White
had given previously. State's exhibit 11 was then tendered and admitted into evidence. 

 Once the State rested, White called several witnesses to testify as to his brain injury
and his good deeds in the community. In particular, Ramona Pumarejo testified that she
has known White for many years and that she cleans his house and answers the phone
for White's business. Ramona did not believe that White was a dangerous man and
thought of him as a helpful and considerate person. She even stated that White was "like
a son to [her.]" She pleaded with the trial court to sentence White to a treatment facility
rather than prison because White "takes care of [her.]" In his closing statement, Gilmore
referenced White's brain injury and requested that the trial court sentence White to a
substance abuse treatment facility rather than prison. The trial court concluded that the
State had proven beyond a reasonable doubt that White had two previous felony
convictions, two previous DWI convictions, and committed the underlying offense. White
was sentenced to twenty-five years' incarceration in the TDCJ-ID.

C. The Hearing on White's Motion for New Trial

 White filed a motion for new trial on January 2, 2009, and the trial court conducted
a hearing on the motion shortly thereafter. In his motion and at the hearing, White argued,
among other things, that the jury's verdict was improper because it was not signed by all
eleven jurors, and that his trial counsel provided ineffective assistance. At the hearing,
White called several witnesses to opine on the effects of his brain injury and how the injury
often caused White to appear as if he was intoxicated. 

 1. White's Evidence

 Jarrett Ursprung, the owner of a local tree service and friend of White's, testified
that, after the accident, White often appeared slow, his speech was slurred, and he was
clumsy. Ramona and Rudolph Pumarejo both testified that, after the accident, White
exhibited signs of intoxication, such as slurred speech and bad balance. Rudolph further
testified that, after the accident, it was difficult to communicate with White and that White
often got angry when attempting to communicate with others. Rudolph noted that White's
personality changed after the accident, and that it often seemed as if White "wasn't all
there." Rudolph testified that White's trial counsel never contacted him to testify. 

 White's friend, Jeffrey Buck, stated that: (1) he was present at the time of the
incident; (2) he was named as a witness in the police report; and (3) he was standing in his
garage when the police arrived. Buck noted that he had known White since high school
and that White had always been a "wild person." Buck further noted that White is "pushy,"
"antsy," "loud," and "bossy," but when he took his medicine, White was "a little more
relaxed." On cross-examination, Buck admitted that he was not close enough to White to
determine if he had been drinking at the time in question. Buck also admitted that he could
not tell if White's demeanor was caused by alcohol, medication, or something else. Buck
testified that he was never asked to testify but that he would have been present if asked. 
Buck also testified that he told the prosecutor that he did not see exactly where White was
at the time in question. 

 White testified that he never communicated with his trial counsel about the case and
that he was not included in the preparation for trial. White noted that he took Lindane to
remedy scabies and that the medication caused him neurological damage. White recalled
an incident in Minnesota where he was riding around on a bicycle allegedly yelling at other
people and generally "acting like a crazy person." White testified that Minnesota police
believed that he was intoxicated and administered a breath test; however, the breath test
revealed that White was not intoxicated. White also recalled that the night before the
incident, he drove back from Alabama, where he attended his mother's funeral, and that
he had not had much sleep that night. White testified that an administrative hearing was
initiated to revoke his driver's license in connection with this incident and the administrative
law judge ruled in White's favor and allowed him to keep his driver's license. White
claimed that: (1) he does not drink anymore; (2) he remembered the State offered him a
plea offer of seven years; and (3) he did not understand that, by rejecting the plea offer,
he would be subject to a punishment range of twenty-five years to life. 

 2. The State's Evidence

 The State called Gilmore to testify as to his representation of White at trial. Gilmore
stated that he has known White for more than ten years and that White had retained his
services. Gilmore did not recall any difference in White's competence or mental abilities
over the ten years he had known him. Gilmore testified that once White was indicted, he
met with White to prepare for trial. Gilmore recalled that White expressed a desire to
secure the presence of his witnesses, who also happened to be his friends. Gilmore
allowed White to secure the presence of the witnesses but instructed White to bring
everyone to Gilmore's office for trial preparation. Gilmore remembered meeting with
Paiyou and Burke, but he noted that Buck never showed up to his office. Gilmore testified
that White told him that Buck "wasn't around anymore . . . that he was out of state or he
was someplace." Gilmore recalled that he got the State's witness list from the District
Clerk. Gilmore testified that he was aware of Paiyou's criminal history, but not Burke's. 
Gilmore further testified that he did not pursue Buck's testimony because Gilmore was
under the impression that Buck did not know the whereabouts of White at the time in
question and that his trial strategy was to demonstrate that White was not driving the truck,
rather than challenging whether White was intoxicated. With respect to Reynaga, Gilmore
stated that his primary concern was not to impeach her with her previous criminal
convictions but, rather, to demonstrate that her testimony was not credible because she
was trying to get White sent to prison in order to get custody of the couple's son.

 The trial court denied White's motion for new trial. 

II. Standard of Review

 A trial court's denial of a defendant's motion for new trial is reviewed for abuse of
discretion. See Holden v. State, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006); see also
Charles v. State, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). 

 We do not substitute our judgment for that of the trial court, but rather
we decide whether the trial court's decision was arbitrary or unreasonable. 
We must view the evidence in the light most favorable to the trial court's
ruling and presume that all reasonable factual findings that could have been
made against the losing party were made against that losing party. Thus, a
trial court abuses it discretion in denying a motion for new trial only when no
reasonable view of the record could support the trial court's ruling.


Charles, 146 S.W.3d at 208.

 The defendant generally has the burden of proof on a motion for new trial. See
Patrick v. State, 906 S.W.2d 481, 498 (Tex. Crim. App. 1995) (en banc). The proponent
of the motion for new trial bears the initial burden of establishing facts entitling him to the
relief sought. See Marquez v. State, 921 S.W.2d 217, 222 (Tex. Crim. App. 1996) (en
banc). Furthermore, at the hearing on a motion for new trial, the trial court is the trier of
fact and the sole judge of the credibility of the witnesses. See Melton v. State, 987 S.W.2d
72, 75 (Tex. App.-Dallas 1998, no pet.) (citing Lewis v. State, 911 S.W.2d 1, 7 (Tex. Crim.
App. 1995)). 

III. Ineffective Assistance of Counsel

 By his first issue, White contends that Gilmore did not provide effective assistance
of counsel. White argues, in several sub-issues, that Gilmore failed to: (1) investigate and
present evidence of his "traumatic brain injury"; (2) "seek out and call witnesses who could
attest to White's medical conditions, to include expert testimony on White's personality
disorder, and . . . seek out fact witnesses"; (3) present the Pumarejos' testimony as to his
post-accident mental state; (4) "investigate previous incidents caused by Mr. White's
mental history and his medical history"; and (5) obtain rulings on various pre-trial motions. 
White asserts that, but for Gilmore's alleged errors, there is a reasonable probability that
the outcome of the trial would have been different. The State argues that the record does
not demonstrate that Gilmore was deficient in his investigation of the case or in pursuing
his trial strategy of establishing that White was not driving the truck at the time in question. 
The State further argues that White did not establish that the witnesses and evidence that
trial counsel allegedly failed to pursue were more than marginally favorable to his defense. 

A. Applicable Law

 To establish a claim for ineffective assistance of counsel, White must show (1) his
attorney's representation fell below an objective standard of reasonableness, and (2) there
is a reasonable probability that, but for his attorney's errors, the result of the proceeding
would have been different. Strickland v. Washington, 466 U.S. 668, 689 (1984);
Hernandez v. State, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986); Jaynes v. State, 216
S.W.3d 839, 851 (Tex. App.-Corpus Christi 2006, no pet.). Whether this test has been
met is to be judged on appeal by the totality of the representation, not by any isolated acts
or omissions. Jaynes, 216 S.W.3d at 851. The burden is on the appellant to prove
ineffective assistance of counsel by a preponderance of the evidence. Id. Our review of
counsel's representation is highly deferential, and we will find ineffective assistance only
if the appellant overcomes the strong presumption that his counsel's conduct fell within the
wide range of reasonable professional assistance. See Strickland, 466 U.S. at 689;
Jaynes, 216 S.W.3d at 851. The right to "reasonably effective assistance of counsel" does
not guarantee errorless counsel or counsel whose competency is judged by perfect
hindsight. Saylor v. State, 660 S.W.2d 822, 824 (Tex. Crim. App. 1983). Further, the acts
or omissions that form the basis of appellant's claim of ineffective assistance must be
evidenced by the record. See Thompson v. State, 9 S.W.3d 808, 814 (Tex. Crim. App.
1999); Jaynes, 216 S.W.3d at 851. In most cases, a silent record which provides no
explanation for counsel's actions will not overcome the strong presumption of reasonable
assistance. Mallett v. State, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001); Thompson, 9
S.W.3d at 813-14.

B. Discussion

 White's primary contention is that Gilmore provided ineffective assistance by failing
to investigate and present evidence of White's brain injury. White alleges that, as a result
of his brain injury, he often had slurred speech and stumbled, which could be interpreted
as being intoxicated. At the motion for new trial hearing, Gilmore testified that he
conceded the issue of intoxication and chose to challenge the State's evidence as to
whether White was operating the truck. The court of criminal appeals recently stated that
"[t]he fact that another attorney may have pursued a different tactic at trial is insufficient to
prove a claim of ineffective assistance.'" Ex parte Miller, No. AP-76,167, 2009 Tex. Crim.
App. LEXIS 1486, at *10 (Tex. Oct. 28, 2009) (quoting Scheanette v. State, 144 S.W.3d
503, 509 (Tex. Crim. App. 2004)). Furthermore, the record reflects that: (1) Paiyou
testified at the guilt-innocence phase as to White's accident and the fact that he had been
in a coma for over thirty days; and (2) Gilmore referenced White's brain injury in his closing
statements, thus alerting the jury to White's brain injury. In addition, White did not present
any expert testimony to support his theory that the brain injury caused him to appear
intoxicated. Instead, White relied on the testimony of friends at the motion for new trial
hearing who speculated as to White's demeanor and whose testimony conflicted with
Gilmore's testimony. Given the nature of the circumstantial evidence suggesting that
White was the driver of the truck at the time in question, we conclude that Gilmore's trial
strategy of attacking the State's evidence as to whether White was driving the truck was
a reasonable trial strategy. Moreover, White has not demonstrated that, based on the
evidence contained in the record, the admission of his medical records and other evidence
documenting his brain injury would have resulted in a different jury verdict, especially in
light of the testimony offered by Officers Rogers and McGinley, who testified that when
they encountered White at the time in question, White had slurred speech, bloodshot eyes,
poor balance, and alcohol on his breath. See Strickland, 466 U.S. at 689; Hernandez, 726
S.W.2d at 57; Jaynes, 216 S.W.3d at 851. 

 White also contends that Gilmore provided ineffective assistance by failing to call
Buck and the Pumarejos to testify as to what happened at the time in question and White's
demeanor. At the hearing on White's motion for new trial, Buck testified that White was
a "wild person" and that he was "loud" and "bossy." Buck admitted that White always acted
this way and that he could not tell whether White's demeanor was caused by alcohol,
drugs, or something else. Moreover, Buck stated that, at the time of the incident, he
observed the police arrive from his garage but that he was unsure as to White's
whereabouts. Gilmore testified that he relied on White to secure the presence of the
witnesses given that White expressed that he would bring his friends to testify on his
behalf. Gilmore further testified that Buck was mentioned as a potential witness, but he
never showed up to Gilmore's office and White informed Gilmore that Buck "wasn't around
anymore." Regardless, Buck's admission that he was unsure of White's whereabouts at
the time in question suggests that his testimony would not have aided the jury in
determining White's sole issue in dispute at trial--whether he was driving the truck.

 With respect to the testimony of the Pumarejos, White alleges that their testimony
would have refuted the State's theory that he was intoxicated and Gilmore's failure to call
them as witnesses amounted to ineffective assistance. As noted earlier, Ramona testified
at the motion for new trial hearing that White's speech was slurred and he had bad balance
as a result of his brain injury. Rudolph noted that White was temperamental, angry, and
"wasn't all there" after sustaining the injury to his brain. This testimony, if true, would have
only been of marginal benefit to White's argument at trial--that he was not driving the truck
at the time in question. At the motion for new trial hearing, White did not elicit testimony
from the Pumarejos stating that they witnessed the incident or had personal knowledge as
to whether White was driving the truck at the time in question. Thus, White has not
demonstrated how Gilmore's failure to call the Pumarejos as witnesses during the guilt-innocence phase caused the jury to improperly convict him.

 White further argues that Gilmore erred in failing to present a police report
documenting an incident in Minnesota where White was mistakenly stopped for being
intoxicated. The police report, which was admitted at the motion for new trial hearing as
defendant's exhibit 10, indicated that White claimed to be drunk at the time of the stop by
Minnesota police and requested to take a breathalyzer test. The results of the test
indicated that White was not drunk, but the officer conducting the stop believed that White
"was just looking for a reaction." Again, this evidence would only be of marginal
significance considering the testimony of Officers Rogers and McGinley who testified that
they smelled alcohol on White's breath and observed White exhibit many other signs of
intoxication. Moreover, this incident does not address whether White drove the truck at the
time in question.

 By his next sub-issue, White complains about Gilmore's preparation and cross-examination of Reynaga and Lugo. In particular, White alleges that Gilmore failed to: (1)
obtain a ruling on his pretrial motion for discovery regarding Reynaga's criminal history; (2)
object to damaging character evidence presented by Reynaga; (3) investigate Reynaga's
impeachment evidence; (4) investigate bias and motive as to Lugo; and (5) request a
limiting instruction as to Reynaga's testimony regarding the alleged bribery of Paiyou. 
Based on our review of the record, we cannot say that White has established that, but for
these alleged isolated incidents, the jury would have rendered a different verdict. 

 With respect to Reynaga, the record reflects that Paiyou testified that White and
Reynaga were in a custody battle over their son and suggested that Reynaga had fled to
Minnesota to keep the child away from White. Reynaga admitted on cross-examination
that when they broke up, she and White were not friendly. In addition, Gilmore, in cross-examining Reynaga, seemed to suggest that Reynaga's testimony was not credible
because she had an interest in seeing White incarcerated in order to obtain custody of the
couple's son. The record also reflects that Gilmore objected numerous times to Reynaga's
testimony, which included references to various bad acts allegedly perpetrated by White. 
Furthermore, at the motion for new trial hearing, Gilmore testified that his primary concern
in cross-examining Reynaga was to present to the jury that Reynaga desired to see White
incarcerated so that she could get custody of their son, rather than to impeach her with her
prior criminal conviction for DWI. We cannot say that this trial strategy was unreasonable.

 With respect to Lugo, both Edward and Reynaga testified that there was a long-standing feud between Lugo and White, which, according to Lugo, centered on the
ownership of a driveway that was situated between White's and Lugo's houses. Clearly,
Gilmore elicited testimony about Lugo's possible bias against White. Furthermore, in light
of the testimony given by Edward and Reynaga, the introduction of the police records
referred to by White on appeal would have been merely cumulative of Edward's and
Reynaga's testimony and would have only been of marginal benefit to the jury in
determining any bias on the part of Lugo.

 White next argues that Gilmore's alleged failure to object or request a limiting
instruction with regard to Reynaga's testimony about the bribery of Paiyou amounted to
ineffective assistance. We first note that the court of criminal appeals has held that
attempts to tamper with a witness or bribe a witness constitutes evidence of
"consciousness of guilt" on the part of the defendant. See Gonzalez v. State, 117 S.W.3d
831, 842 (Tex. Crim. App. 2003); Wilson v. State, 7 S.W.3d 136, 141 (Tex. Crim. App.
1999); Ransom v. State, 920 S.W.2d 288, 299 (Tex. Crim. App. 1996) (op. on reh'g) ("We
have held that criminal acts that are designed to reduce the likelihood of prosecution,
conviction, or incarceration for the offense on trial are admissible under Rule 404(b) as
showing 'consciousness of guilt.'"); see also Tex. R. Evid. 404(b) (providing that extraneous
acts are generally inadmissible at the guilt-innocence stage of trial). Therefore, evidence
of the alleged bribe was admissible to impeach Paiyou's testimony and to indicate White's
consciousness of guilt. In any event, the record reflects that Gilmore objected to this
testimony as hearsay, which the trial court, after conducting a hearing outside the presence
of the jury, overruled. Nevertheless, White does not show how any limiting instruction
would have been consistent with the defensive issues raised at trial. See Ex parte Varelas,
45 S.W.3d 627, 632 (Tex. Crim. App. 2001). Moreover, the record is silent as to nuances
of Gilmore's trial strategy in not requesting a limiting instruction regarding Reynaga's
testimony about the bribery. See Mallett, 65 S.W.3d at 63; Thompson, 9 S.W.3d at
813-14. Thus, we cannot say that appellant met his burden of showing that Gilmore's
assistance was ineffective with respect to this sub-issue.

 In his final sub-issue, White complains that Gilmore failed to obtain a ruling on
collateral estoppel. Specifically, White argues that the State was collaterally estopped from
pursuing the DWI charge because an administrative law judge had concluded previously
that the State lacked probable cause for the arrest. This argument, however, is without
merit in light of section 724.048(a) of the transportation code, which provides that: 

 The determination of the department of administrative law judge . . . is a civil
matter . . . is independent of and is not an estoppel as to any matter in issue
in an adjudication of a criminal charge arising from the occurrence that is the
basis for the suspension or denial; and . . . does not preclude litigation of the
same or similar facts in a criminal prosecution.


Tex. Transp. Code Ann. § 724.048(a) (Vernon 1999); see Reynolds v. State, 4 S.W.3d 13,
18-21 (Tex. Crim. App. 1999). Therefore, the State was not collaterally estopped from
prosecuting White for the underlying offense even though the administrative law judge
determined that White's arrest was not supported by probable cause. The record does not
support a finding that Gilmore provided ineffective assistance by failing to obtain a ruling
on collateral estoppel. 

 In reviewing the totality of Gilmore's representation of White, we cannot say that
White has overcome the "strong presumption" that Gilmore provided reasonable
assistance. See Strickland, 466 U.S. at 689; Jaynes, 216 S.W.3d at 851. White's first
issue is overruled.

IV. The Enhancement Paragraph

 By his second issue, White asserts that the State failed to produce legally and
factually sufficient evidence to support the enhancement paragraph contained in the
indictment, which subjected him to an enhanced punishment under the habitual felony-offender statute. See Tex. Penal Code Ann. § 12.42(d). White argues that his two
previous felony convictions ran concurrently and were executed on the same day, which
suggests that his first conviction for retaliation was not "final" at the time that the offense
made the basis of the second conviction was committed, and thus, did not follow the
prescribed sequence for enhancement under section 12.42(d) of the penal code. See id. 
The State contends that it followed the proper sequence and presented legally and
factually sufficient evidence to support the enhancement of White's punishment. 

A. Applicable Law

 The court of criminal appeals has recently stated the following with respect to the
sufficiency of the evidence supporting punishment enhancement for habitual felony
offenders:

 The law concerning sufficiency of the evidence to prove enhancement for
habitual felony offenders is well settled. Section 12.42(d) of the Penal Code
requires the State to prove this chronological sequence of events:


 "(1) the first conviction becomes final;

 

 (2) the offense leading to a later conviction is committed;


 (3) the later conviction becomes final;

 

 (4) the offense for which the defendant presently stands accused is
committed."


Ex parte Miller, 2009 Tex. Crim. App. LEXIS 1486, at *35 (quoting Jordan v. State, 256
S.W.3d 286, 290-91 (Tex. Crim. App. 2008)); see Valdez v. State, 218 S.W.3d 82, 84 (Tex.
Crim. App. 2007); see also Tex. Penal Code Ann. § 12.42(d). 


 The State carries the burden of proving beyond a reasonable doubt that a
defendant's second previous felony conviction was committed after the
defendant's first previous felony conviction became final. And when, "there
is no evidence to show that the offenses were committed and became final
in the proper sequence, the defendant's sentence may not be enhanced
under the State's habitual offender statutes." 


Jordan, 256 S.W.3d at 291 (quoting Tomlin v. State, 722 S.W.2d 702, 705 (Tex. Crim. App.
1987)) (emphasis in original). The Jordan court further noted that:

 At the sentencing phase, neither party carries the burden of proving
what punishment should be assessed within the statutorily prescribed range
applicable to a given offense. Generally, the fact[]finder's decision of what
particular sentence to assess is a "normative, discretionary function" that
does not depend on the resolution of specific facts. However, when the
State seeks to enhance a defendant's sentence for the primary offense by
alleging that a defendant has a prior conviction, and the defendant enters a
plea of not true, the fact[]finder must decide whether the State has sustained
its burden by entering a finding that the enhancement allegation is either true
or not true. In essence, the assessment of punishment involves two types
of deliberations when the State has alleged, and the defendant has entered
a plea of not true to, a prior conviction used for enhancement purposes. 
First, the fact[]finder engages in a deductive, discrete fact-finding process to
determine whether the State has proved that the enhancement allegation is
true. And second, considering all of the evidence admitted during the guilt
and punishment phases, the fact[]finder engages in a normative process that
is uninhibited by any required, specific fact determination to decide what
particular punishment to assess within the range prescribed by law.


Id. at 291-92 (internal citations omitted). A failure of proof supporting the enhancement is
not subject to a harmless error analysis; instead, "it is a sufficiency-of-evidence deficiency
that can 'never be considered harmless.'" Ex parte Miller, 2009 Tex. Crim. App. LEXIS
1486, at *36 (quoting Jordan, 256 S.W.3d at 292).

 The general rule, within the context of section 12.42 of the penal code, is that a 
conviction from which an appeal has been taken is not considered to be a final conviction
until the conviction is affirmed by the appellate court and that court's mandate of
affirmance becomes final. See Jones v. State, 711 S.W.2d 634, 636 (Tex. Crim. App.
1986) (en banc). The court of criminal appeals has held that:

 [A]fter the State establishes that a defendant has been previously convicted,
this Court will presume that a conviction is final when faced with a silent
record regarding such. Put another way, in the absence of evidence to the
contrary, this Court presumes the regularity of the trial court's judgment and
records. Thus, when the State offers into evidence a certified copy of a
judgment and sentence, it has made a prima facie case that the conviction
reflected within that judgment and sentence is a final conviction worthy of
respect. That evidence is legally and factually sufficient to prove that a prior
conviction is a final conviction absent any evidence to the contrary. If the
judgment of conviction has been set aside, vacated or appealed, the
defendant must offer some evidence to support that fact. Once the
defendant offers that evidence, the State must prove, beyond a reasonable
doubt, that the conviction has been affirmed and the mandate has issued. 


 . . . .

 

 Although the wish may be father to the thought, the possibility of a future
appeal is not the fact of a present appeal. The right to take an appeal does
not equal the pendency of an appeal.

 

 . . . .

 

 Only when there is evidence that the defendant actually perfected an appeal
is the conviction deemed to be lacking finality.


Jones v. State, 77 S.W.3d 819, 822-24 (Tex. Crim. App. 2002) (citations and quotation
marks omitted). In other words, the "'burden is on the State to make a prima facie showing
that any prior conviction alleged for enhancement, or for punishing an accused as a repeat
offender, became final before the commission of the primary offense, and once such a
showing is made, the burden shifts to the defendant to prove otherwise.'" Jones, 711
S.W.2d at 635 (quoting Diremiggio v. State, 637 S.W.2d 926, 928 (Tex. Crim. App. 1982)). 

B. Discussion

 Here, the indictment contained an enhancement paragraph providing that White had
two previous felony convictions for retaliation and bail jumping. The indictment further
provided that White had two previous DWI convictions occurring on February 4, 1998, and
December 15, 1998. White pleaded "not true" to the portion of the indictment referring to
his two previous DWI convictions and to the enhancement paragraph pertaining to the
retaliation and bail jumping convictions. After reviewing the evidence presented at the
punishment phase, the trial court concluded that the State had proven beyond a
reasonable doubt that White had two previous DWI convictions and two previous felony
convictions for retaliation and bail jumping. Thus, White was sentenced to twenty-five
years' imprisonment, in accordance with the punishment range prescribed in section
12.42(d) of the penal code. See Tex. Penal Code Ann. § 12.42(d).

 On appeal, White only challenges the enhancement of his sentence with respect to
the felony retaliation and bail jumping convictions; he does not dispute the trial court's
finding that he had been convicted previously of two DWIs. In proving that White had two
prior felony convictions, the State submitted into evidence the judgments corresponding
to White's retaliation and bail jumping convictions. The judgment pertaining to White's
retaliation conviction reflected that White was placed on probation for the offense, and that
the State filed its motion to revoke on July 9, 1994. White's probation was revoked on
February 23, 1995, and he was sentenced to two years' confinement. Furthermore, the
judgment corresponding to White's felony bail jumping conviction reflects that the offense
was committed on March 31, 1995, and he was convicted of the offense on September 15,
1995. The trial court sentenced him to two years' confinement, to run concurrently with the
sentence imposed in the retaliation case. White did not present any evidence indicating
that either of these convictions were appealed. See Milburn v. State, 201 S.W.3d 749, 751
(Tex. Crim. App. 2006) (stating that a prior conviction is not final if defendant still has time
to file a motion for new trial or a notice of appeal); see also Jones, 77 S.W.3d at 822-24. 

 The court of criminal appeals has held that a probated sentence is not a final
conviction for enhancement purposes under section 12.42 of the penal code unless
probation is revoked and any appeal of the revocation has been resolved. Jordan v. State,
36 S.W.3d 871, 875 (Tex. Crim. App. 2001) (citing Ex parte Langley, 833 S.W.2d 141, 143
(Tex. Crim. App. 1992); Ex parte Miller, 552 S.W.2d 164, 165 (Tex. Crim. App. 1977)). 
Because the record does not reflect that White appealed his retaliation conviction, this
conviction became final for purposes of enhancement on the date his probation was
revoked--February 23, 1995. See id. Moreover, because White committed the offense
of felony bail jumping on March 31, 1995, or, in other words, after his retaliation conviction
became final, and because White's bail jumping conviction became final on September 15,
1995, before his conviction in the present case, we conclude that the State followed the
proper sequence prescribed in section 12.42(d) of the penal code and proved beyond a
reasonable doubt that White had been convicted previously of two felonies. See Tex.
Penal Code Ann. § 12.42(d); see also Ex parte Miller, 2009 Tex. Crim. App. LEXIS 1486,
at *35; Jordan, 256 S.W.3d at 291. As such, we cannot say that the enhancement of
White's sentence under the habitual felony offender statute was supported by legally or
factually insufficient evidence. See Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App.
2007) (holding that in a legal sufficiency review, we view the relevant evidence in the light
most favorable to the verdict to determine whether a rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt); see also Watson v. State,
204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006) (holding that in a factual sufficiency
review, we review the evidence in a neutral light to determine whether the evidence is so
weak that the jury's verdict seems clearly wrong and manifestly unjust or against the great
weight and preponderance of the evidence). We overrule White's second issue. 

V. The Judgment and the Jury's Verdict

 In his final issue, White argues, for the first time on appeal, that the judgment did
not constitute a unanimous verdict because it was rendered by eleven jurors and was
signed only by the presiding juror. See Tex. Code Crim. Proc. Ann. art. 36.29. The State
asserts that White waived any error by failing to object. It also argues that the judgment
was valid because the jury was polled and each juror answered that the verdict was theirs.
A. Applicable Law

 "Under our state constitution, jury unanimity is required in felony cases, and under
our state statutes, unanimity is required in all criminal cases." Ngo v. State, 175 S.W.3d
738, 745 (Tex. Crim. App. 2005). Pursuant to article 36.29 of the code of criminal
procedure, not less than twelve jurors can render and return a verdict in a felony case, and
the verdict must be "concurred in by each juror and signed by the foreman." Tex. Code
Crim. Proc. Ann. art. 36.29(a) (Vernon Supp. 2009). Article 36.29 also provides that, in
the event that a juror dies or becomes disabled from serving on the jury, "the remainder of
the jury shall have the power to render the verdict." Id. "When the verdict shall be
rendered by less than the whole number, it shall be signed by every member of the jury
concurring in it." Id. 

 However, Texas courts, in construing article 36.29, have held that a defendant may
waive the requirement of a jury comprised of twelve jurors by failing to object when the trial
proceeded with eleven jurors. See Hatch v. State, 958 S.W.2d 813, 815-16 (Tex. Crim.
App. 1997) (en banc) (holding that a defendant may waive the right to a jury composed of
twelve persons in noncapital felonies and capital felonies where the prosecution does not
seek the death penalty) (citing McMillan v. State, 122 Tex. Crim. 583, 57 S.W.2d 125
(1933)); see also Shaw v. State, No. 05-00-00186-CR, 2000 Tex. App. LEXIS 7740, at **6-7 (Tex. App.-Dallas Nov. 15, 2000, no pet.) (mem. op., not designated for publication)
(holding that defendant waived error by failing to object in a case where the jury was
comprised of eleven jurors, only the presiding juror signed the verdict, and the jurors were
polled).

B. Discussion

 In this case, one juror was excused from serving on the jury and both parties agreed
to proceed to verdict with eleven jurors, thereby waiving the requirement that the jury, in
a felony case, must be comprised of twelve jurors. See Tex. Code Crim. Proc. Ann. art.
36.29(a); see also Hatch, 958 S.W.2d at 815-16. At no point did White object to (1)
proceeding with eleven jurors, or (2) the verdict being signed only by the presiding juror. 
Because White agreed to proceed with eleven jurors, and because White failed to object
to the verdict only being signed by the presiding juror, we conclude that White has waived
this issue. See Tex. R. App. P. 33.1(a); Hatch, 958 S.W.2d at 815-16; Renner v. State, 758
S.W.2d 890, 891 (Tex. App.-Corpus Christi 1988, pet. ref'd) (concluding that appellant
waived his contention regarding an eleven-juror verdict signed by the presiding juror alone
by failing to object at the trial court); see also Shaw, 2000 Tex. App. LEXIS 7740, at **6-7. 
Moreover, even if the lack of individual signatures on the jury's verdict was error, White was
not harmed because: (1) the jurors were polled; (2) each juror expressed that the guilty
verdict was their verdict; and (3) White did not request any additional polling of the jury. 
Therefore, any error associated with the omission of the individual signatures on the verdict
form did not affect White's substantial rights and is, thus, harmless. See Tex. R. App. P.
44.2(b); see also Shaw, 2000 Tex. App. LEXIS 7740, at *7. White's third issue is
overruled. 

VI. Conclusion

 Because we have determined that: (1) White has failed to overcome the "strong
presumption" that Gilmore provided reasonable assistance; (2) the enhancement of
White's sentence was supported by legally and factually sufficient evidence; and (3) White
waived any error associated with the jury's verdict, we conclude that the trial court did not
abuse its discretion in denying White's motion for new trial. See Holden, 201 S.W.3d at
763; see also Charles, 146 S.W.3d at 208. Accordingly, we affirm the judgment of the trial
court. 


 ________________________

 DORI CONTRERAS GARZA

 Justice 


Do Not Publish. 

Tex. R. App. P. 47.2(b)

Delivered and filed the 

21st day of January, 2010.
1. Section 12.42(d) of the penal code provides the following:


 Except as provided by Subsection (c)(2), if it is shown on the trial of a felony offense other
than a state jail felony . . . that the defendant has previously been finally convicted of two
felony offenses, and the second previous felony conviction is for an offense that occurred
subsequent to the first previous conviction having become final, on conviction he shall be
punished by imprisonment . . . for life, or for any term of not more than 99 years or less than
25 years.


Tex. Penal Code Ann. § 12.42(d) (Vernon Supp. 2009).
2. White's trial counsel requested a mistrial, but then expressed that his client desired to proceed with
eleven jurors.